STEWART v. STATE.

Opinion delivered May 16, 1921.

1.  HOMICIDE—VOLUNTARY MANSLAUGHTER—EVIDENCE.—In a prosecution for murder in which defendant claimed to have acted in self-defense, evidence *held* to sustain a conviction of voluntary manslaughter.

2.  CONTINUANCE—CUMULATIVE EVIDENCE.—A continuance asked for the absence of evidence that was merely cumulative in its nature was properly refused by the court.

3.  HOMICIDE—DEFENSE OF HABITATION—INSTRUCTION.—In a homicide prosecution, refusal of an instruction submitting the issue whether defendant acted in defense of his habitation or property, under Crawford & Moses' Dig., § 2367, *held* proper where there was no evidence upon which to base it.

4.  HOMICIDE—SELF-DEFENSE—INSTRUCTION.—In a prosecution for murder, an instruction on justifiable homicide approved.

5.　CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—Refusal of instructions covered by those given by the court *held* proper.

6.　HOMICIDE—DYING DECLARATIONS.—Dying declarations, to be admissible, must be made under a sense of certain and impending death. In determining this question, the court may consider all the facts and surrounding circumstances, such as the character of the wound, the declaration of the deceased that he would not live, and the fact that he died shortly afterward.

7.　HOMICIDE—DYING DECLARATIONS—WEIGHT.—It is the province of the jury to weigh dying declarations and the circumstances under which they were made, and to give them only such credit, upon the whole evidence, as they think they deserve.

8.　HOMICIDE—ADMISSIBILITY OF THREATS.—Threats of violence toward the defendant, alleged to have been made by the deceased, unaccompanied with overt acts showing an intent to carry them into effect, are competent in a homicide case to show deceased's character for violence and his disposition of mind toward defendant, to be considered in determining who was the aggressor.

Appeal from Randolph Circuit Court; *J. B. Baker,* Judge; affirmed.

*Schoonover & Jackson, Smith & Gibson* and *Ponder & Gibson,* for appellant.

1.　The court erred in refusing a continuance. The grounds set up the absence of witnesses whose testimony was material. There was an abuse of discretion by the trial court. 109 Ark. 407; 120 *Id.* 172. Threats has been made, and the testimony of the absent witnesses was material and vital. *Ib.*

2.　Instruction No. 1, asked by appellant, stated the law and should have been given.

3.　Instructions 2, 3 and 4 were the law and should have been given. They were in regard to threats, and correctly stated the law as ruled by this court. 79 Ark. 594; 82 *Id.* 595; 84 *Id.* 120.

Instruction No. 7 should have been given as to dying declarations. 38 Ark. 498; 81 *Id.* 417; 58 *Id.* 47; 104 *Id.* 162; 113 *Id.* 142.

*J. S. Utley,* Attorney General, and *Elbert Godwin* and *W. T. Hammock,* Assistants; for appellee.

1. There was no error in refusing the continuance. Crutchfield was not subpoenaed as a witness. Besides, all the alleged testimony was merely *cumulative,* and the continuance properly refused. 74 Ark. 444. It was not shown that the absent witness was within the jurisdiction of the court, nor what it was expected to be proved by him. 93 Ark. 290; 120 *Id.* 562. The same rules apply to the testimony of Nannie Wilcutt and Jim McCluskey. There was no abuse of discretion by the court. 99 Ark. 394, cited by appellant, is not in point, as the facts are entirely different.

2. There is no error in the instructions. The plea of self-defense was correctly stated, and the evidence sustains the verdict.

HART, J. Bill Stewart was indicted for the crime of murder in the first degree and convicted of voluntary manslaughter, his punishment being fixed by the jury at two years in the State penitentiary. From the judgment of conviction he has duly prosecuted an appeal to this court.

On the 13th day of August, 1920, Bill Stewart, about eighteen years of age, killed Hubert Wilcutt, about twenty years of age, by shooting him twice with a shotgun loaded with large-sized shot. The killing occurred in a field where both parties were at work at about 8 o'clock in the morning in Randolph County, Arkansas. Elmer Wilcutt, a brother of the deceased, saw Harry Stewart standing in the corner of a patch of corn waiting for his brother. He then saw Bill Stewart come up to Harry Stewart with something in his hand. He started home and had gone about a half a quarter when he heard the report of a gun and looking around saw the smoke of it. After he had gone about ten feet he heard the gun shoot again and then saw the defendant and his brother riding across the field on the same horse in a long lope. Elmer Wilcutt went down to where the shooting oc-

curred and found his brother, Hubert, lying down on the ground. He had been shot in the head, neck, shoulder, thigh, and also in his private parts. Hubert Wilcutt told his brother that he was going to die just as soon as he got to him. He did die from the effect of the wounds at about 12 o'clock of that day.

Jim Hibbard also came up soon after the shooting occurred, and Hubert Wilcutt told him that he was going to die. He told his brother, and also Hibbard, that Bill Stewart and Harry Stewart were both present when he was shot; that Bill Stewart said, "I am going to put your light out," and then shot him. After Wilcutt fell Harry Stewart, who was standing by with a corn knife in his hand, said, "Shoot him again," and Bill Stewart shot Wilcutt again while he was lying down on the ground.

Two physicians attended Hubert Wilcutt and testified that both wounds were necessarily fatal. Hubert Wilcutt made a dying declaration to them about the killing in practically the same language detailed above.

According to the testimony of Jim Hibbard, he lived near the place where Bill Stewart killed Hubert Wilcutt. Stewart came to his house on horseback between seven and eight o'clock on the morning of the killing and asked Hibbard for a gun, telling him he wanted it to shoot some rabbits that were eating his cabbage. Hibbard let him have his shotgun and five shells, telling him that the shells were loaded with shot too big for rabbits. In fifteen or twenty minutes thereafter he heard two shots down in the field, and upon going there found Hubert Wilcutt lying on the ground fatally wounded.

Dick Tippett testified that on the morning of the killing he found Hubert Wilcutt lying on the east side of a ditch. Hubert Wilcutt told him that he was going to die, and that Bill Stewart had killed him. He said that Bill Stewart and his brother passed by, and that they had a few words. Stewart and his brother went off and slipped back again, and Bill Stewart said, "I am going to put your light out." He then shot Hubert Wilcutt

and came up closer to him and shot him again. The ditch near where Hubert Wilcutt was found is about nine feet wide and two and a half feet deep. Bill Stewart and his brother were on the opposite side of the ditch from Hubert Wilcutt when he was shot.

Bill Stewart was a witness for himself. According to his testimony, he drove up near Hubert Wilcutt with his horse hitched to a plow. Wilcutt noticed that something was the matter with the horse and examined him. Then Stewart started on to where he was going to work. As he passed Hubert Wilcutt, the latter jerked him down and cursed and abused him. He followed Stewart through the field and told him that he would kill him and also his brother if he did not leave the farm. Stewart was afraid of Wilcutt and took his horse out of the plow and went to Mr. Hibbard's to borrow a gun. Wilcutt followed him a piece and threw a chunk at him, which hit the horse. Stewart borrowed the gun from Hibbard and went back to work. When he got back, Hubert Wilcutt told him he should not go to work, and that if he crossed the ditch he would kill him. Stewart said that he was going to work and started to do so. Hubert Wilcutt then started toward Stewart and threw his hand to his hip. Stewart then shot him. Wilcutt kept going toward Stewart, cursing and abusing him, and Stewart shot him again. Stewart said that he never slipped up on Wilcutt and shot him because Wilcutt threw his hands to his hip pocket and started toward him. George Arnold and Russell Hinton both had told him that Wilcutt said that he was going to kill him. ' Wilcutt had told Stewart that he had come back there to kill him. They had had a difficulty about a year before, and Wilcutt had beaten up Stewart and broken his leg.

George Arnold and Russell Hinton both testified that Hubert Wilcutt told them that he was going to kill Bill Stewart, and that they had communicated this threat to Stewart before the morning of the killing.

John Thornberry also testified that the deceased had told him that he intended to get a job of work on the farm where the defendant was working, and if he got a chance he was going to kill him.

Alfred Terry, a deputy sheriff, testified that Hubert Willcutt had told him that he was going to have revenge on Bill Stewart and his brother for the way they had treated him. It was also proved by the defendant that the deceased was a quarrelsome, overbearing and dangerous man.

The evidence for the State showed that deceased had no gun in his pocket but had a pocket knife when he was killed.

It is not contended by counsel for the defendant that the evidence is not legally sufficient to support the verdict, and a mere reading of it shows that it was amply sufficient.

Counsel for the defendant, however, earnestly insist that the judgment should be reversed because the court erred in refusing to grant him a continuance. The defendant asked for a continuance on the ground that three witnesses, including the wife of the deceased, would testify, if present, that the deceased bore the reputation of being a dangerous, quarrelsome and overbearing man, and that they had heard him threaten to take the life of the deceased; that his widow would testify that he had gone back there and secured work on the farm where the defendant was working for the very purpose of killing him. The record does not show that these threats were communicated to the defendant.

Other witnesses testified in behalf of the defendant to the effect that deceased had the reputation of being a man of quarrelsome, overbearing, and violent disposition, and that the deceased had told them that he was going to kill the defendant, and that they had communicated these threats to the defendant prior to the killing. One of the witnesses said that the deceased had told him that he had come back there and secured work on the farm where

the defendant was working for the very purpose of getting a chance to kill him. Thus it will be seen that the continuance was asked for the absence of evidence merely cumulative in its nature and was properly refused by the court. *Allison* v. *State,* 74 Ark. 444; *Rider* v. *State,* 140 Ark. 1, and *Snow* v. *State,* 140 Ark. 7.

It is next insisted by counsel for the defendant that the court erred in not giving instruction No. 1 asked by the defendant. The instruction is an exact copy of section 2369 of Crawford & Moses' Digest. The killing was not in defense of the habitation or the property of the defendant. Therefore there was no evidence upon which to base it, and the court properly refused to give it. In this connection it may be stated that the court gave full and fair instructions on the question of justifiable homicide. ·

It is also insisted that the court erred in giving instructions Nos. 2, 3 and 4, asked by the defendant. These instructions were all on the subject of justifiable homicide and were covered by instruction No. 5 given by the court, and we do not deem it necessary to set out the refused instructions.

Instruction No. 5 reads as follows: "You are instructed that the defendant in this case pleads self-defense in justification of his act in shooting and killing the deceased. Self-defense is a legal defense, and one which would entitle the defendant to an acquittal, if the jury finds from the evidence in this case that the defendant acted in self-defense at the time of the killing. And it need not appear, in order that the defendant may plead self-defense, that the defendant was actually in danger of losing his life, or receiving great bodily harm, at the hands of the deceased; but, if you believe from the evidence in the case that the defendant, acting in good faith, and without fault or carelessness on his part, honestly believed, at the time he fired the fatal shot, that he was in danger of losing his life, or of receiving great bodily harm at the hands of the deceased, then the defendant

would be entitled to an acquittal, even though you should further find that the defendant was in no actual danger of losing his life or receiving great bodily harm at the hands of the deceased at the time he fired the fatal shot.''

It is apparent from reading this instruction that the court gave all that the defendant was entitled to on this phase of the case.

It is also insisted by counsel for the defendant, that the court erred in refusing to give instructions Nos. 5, 6 and 7, asked by the defendant. We do not deem it necessary to set out these instructions. They were on the subject of threats and the weight to be given to dying declarations. The refused instructions were fully covered by other instructions given by the court.

In *Robinson* v. *State,* 99 Ark. 209, the court said that dying declarations to be admissible must be made under a sense of certain and impending death. In determining this question the court may consider all the facts and surrounding circumstances, such as the character of the wound itself, the declaration of the deceased himself that he could not live, and the fact that he died shortly afterward. See, also, *Rhea* v. *State,* 104 Ark. 162.

The court told the jury that it was its province to weigh the dying declarations and the circumstances under which they were made, and to give them only such credit, upon the whole evidence, as they might think they deserved.

The instructions on this point were full and complete and in accord with the principles of law uniformly laid down by this court.

In *Harper* v. *State,* 79 Ark. 594, the court held that threats of violence toward the defendant, alleged to have been made by the deceased, unaccompanied with overt acts showing an intent to carry them into effect, are competent in a homicide case to show deceased's character for violence and his disposition of mind toward defendant, to be considered in determining who was the aggressor. The testimony of this character was admit-

ted by the court to go to the jury, and the jury was instructed upon this phase of the case in accordance with the rule just announced.

The court also instructed the jury on the question of reasonable doubt and fully and fairly submitted the respective theories of the State and of the defendant to the jury under proper instructions.

We find no prejudicial error in the record, and the judgment must be affirmed.