# CASES DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS

## BURNS v. STATE.

### Opinion delivered September 25, 1922

1. HOMICIDE—ADMISSIBILITY OF DYING DECLARATIONS.—The admissibility of alleged dying declarations is for the court to determine, and the weight and credit to be given them is for the jury.

2. HOMICIDE—DYING DECLARATIONS—MATTERS CONSIDERED.—In determining whether dying declarations were made under a sense of certain and impending death, the court may consider all the facts and surrounding circumstances, such as the character of the wound itself, the declarations of deceased that he could not live, and the fact that he died shortly thereafter.

3. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Deceased's dying declaration that defendant shot him, together with corroborating circumstances, held sufficient to sustain a conviction for murder in the first degree.

4. HOMICIDE—EVIDENCE OF QUARREL IN WHICH DEFENDANT TOOK SIDES.—In a murder case, where there was evidence of bad feelings between deceased's family and the family for which defendant was working, evidence that defendant took sides with the latter family was admissible.

5. CRIMINAL LAW—EVIDENCE OF QUARREL IN DEFENDANT'S ABSENCE.—Where there was evidence that defendant and his employers conspired to kill deceased because of bad feeling growing out of disputes between a school teacher and the employer's children, evidence of a quarrel between the teacher and the children in defendant's absence was admissible.

6. CRIMINAL LAW—PROOF OF CONSPIRACY.—Proof of a conspiracy between defendant and others is a preliminary question to be passed upon by the court before admitting evidence of acts and declarations of the conspirators.

7. CRIMINAL LAW—ACTS AND DECLARATIONS OF CONSPIRATORS.—Where evidence offered is sufficient to make a *prima facie* showing of a conspiracy, evidence of all the acts and declarations of each conspirator are admissible against his co-conspirator.

8.  HOMICIDE—PUNISHMENT AS PART OF THE VERDICT.—Under Craw-
ford & Moses' Dig., § 3205, requiring the jury to ascertain the
degree in all cases of murder, and § 3206, authorizing the jury
in all cases where the punishment is now death by law to render
a verdict of life imprisonment, the fixing of the punishment for
first degree murder must be a part of the verdict.

9.  HOMICIDE—SUFFICIENCY OF VERDICT.—Under Crawford & Moses'
Dig., §§ 3205-6, where defendant was indicted for murder in the
first degree, a verdict stating that the jury "find the defendant
guilty and place his punishment for life in the State Peniten-
tiary," sufficiently showed that they found him guilty of murder
in the first degree.

10.  CRIMINAL LAW—ORDER OF TRIAL OF DEFENDANTS JOINTLY INDICTED.
—Crawford & Moses' Dig., providing that defendants, jointly
indicted for felony, may elect the order in which their cases shall
stand upon the docket for trial, merely fixes the order in which
the cases shall be called for trial, and does not require that the
case of the defendant first placed upon trial, as to whom the
jury disagreed, shall be finally disposed of before the other de-
fendant is tried.

11.  CRIMINAL LAW—INSTRUCTIONS ALREADY COVERED.—Where the in-
structions given fully submitted the respective theories of the
State and the defendant, requested instructions which were either
covered by those given or were argumentative in form were
properly refused.

Appeal from Newton Circuit Court; *J. M. Shinn*, Judge; affirmed.

*E. G. Mitchell,* for appellant.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *W. T. Hammock,* Assistants, for appellee.

HART, J.  Charley Burns was indicted for the crime of murder in the first degree, charged to have been committed by killing Elijah Roberts by shooting him at his home in Newton County, Ark.

The defendant was tried before a jury, which fixed his punishment at imprisonment for life in the penitentiary, and he has duly prosecuted an appeal to this court.

The first assignment of error is that the evidence is not legally sufficient to support the verdict.

It appears from the record that Elijah Roberts was killed at his home in Newton County, Ark., on the night

of September 10, 1921. According to the testimony of the wife of the deceased, she and her husband had gone to bed and were asleep. They were awakened by the barking of their dog. The husband thought that his mare was in the fodder at the barn, and told his wife that he would go out there and tie the mare up. He took his bridle and lantern and went towards the barn. In a few minutes Mrs. Roberts heard her husband scream. She ran to the door and met her husband coming to the house. He said that he had been shot and killed. He asked her to go and get Alex Lewis and his wife, who lived about a quarter of a mile away. He said that he was going to die, and asked his wife to pray for him. She made a short prayer for him and then went for Mr. and Mrs. Lewis. They immediately dressed and returned home with her. After they got back home she asked her husband, could it have been Roscoe Dixon that shot him? Her husband replied: "No." The deceased had already stated a number of times that Charley Burns had done the killing. The deceased died the next morning after he was shot, at about seven o'clock. He realized that he was going to die, and stated to every one who came in that he was going to die, and that Charley Burns had shot him.

Some one shot the deceased about the waist line on his right side, and this caused his death.

George Roberts, the father of the deceased, was notified of the shooting, and went to the home of his son. His son took him by the hand and said, "Pa, they have killed your boy." The deceased was about twenty-five years old. The witness said, "Son, do you know who done it?" The deceased replied, "Yes, Charley Burns killed me. I heard the racket of my fodder rattling, and my dog kept barking, and I got up and lighted my lantern and went out there. When I got to the feed trough, and just as I stepped over it, I heard some one say, 'Now,' and then a gun fired and Charley Burns said, "God damn him, I got him'." Again the witness said, "Son, couldn't you be mistaken?" The deceased replied,

"No; Pa, I know who killed me." The deceased said that his "dying testimony" was that he knew that Charley Burns had killed him.

Other neighbors were witnesses in the case and testified that they went to the deceased's house after he had been shot. The deceased told them that he was going to die, and that Charley Burns had killed him.

According to the testimony of Mrs. Sarah Simpkins, on the Sunday before Elijah Roberts was killed she saw Charley Burns and Leonard Cranford riding mules down the road. She saw that they were drunk, and stepped out behind some bushes to permit them to pass. They were talking pretty loud, and Charley Burns said, "God damn him; we'll get him some night; we'll fix him so he won't be no witness against us." She did not know to whom they had reference.

Another witness testified that on the Sunday preceding the killing of Elijah Roberts on Saturday night, she was at Hawley's store, and that Charley Burns and Leonard Cranford came into the store and bought four cartridges. It was nearly dark at the time.

It also appears from the record that Elijah Roberts was a school director, and that the Cranfords had trouble with a young lady whom the directors had employed to teach school. The trouble between the teacher and the Cranfords resulted in breaking up the school. The deceased took the part of the teacher. A short time before the killing the lady teacher and the mother of the deceased had a difficulty with the Cranford girls at the schoolhouse. The defendant and some of the Cranford boys actively took the part of their sisters. The defendant encouraged them to carry on the difficulty. The father of the Cranford boys on several occasions stated that the Roberts were causing his family trouble, and threatened them in various ways.

Another witness testified that Leonard Cranford and Charley Burns came to the home of one of the directors, where she was staying, after the school had been broken

up, and wanted to know if school would begin the next Monday. Leonard Cranford said that he was not going to have anything to do with any of the teachers. Charley Burns did not say much of anything. The defendant was working for the Cranfords and staying at their home at the time the killing occurred. Some time prior to this, however, he had lived at the home of the deceased and had worked for him. The above is the substance of the testimony introduced by the State.

The defendant was a witness for himself, and denied that he shot the deceased. He stated that he was on good terms with the deceased and had no animosity toward him at all. He admitted that he was working for the Cranfords, but stated that he did not participate in any ill feeling that they might have towards the deceased.

His testimony was corroborated by that of the Cranfords, and several witnesses testified that the defendant was out hunting the night the deceased was shot, and was several miles away from the scene of the killing.

The main reliance of the State for a conviction was the dying declarations of the deceased. On this point the law is that the admissibility of such declarations is for the court to determine, and the weight and credit to be given them is for the jury. *Freels* v. *State,* 130 Ark. 189.

In determining whether the dying declarations were made under a sense of certain and impending death the court may consider all the facts and surrounding circumstances, such as the character of the wound itself, the declarations of the deceased himself that he could not live, and the fact that he died shortly afterward. *Stewart* v. *State,* 148 Ark. 540.

The undisputed evidence shows that the deceased received a gunshot wound about ten or eleven o'clock in the night, and died as the result thereof the next morning at seven o'clock. He realized that he was going to die, and so stated to a number of his neighbors who were called in after he was shot. Therefore the evidence met all the requirements of the law with regard to the admissibility of dying declarations.

The circumstances under which the death occurred show that whoever killed the deceased was guilty of murder in the first degree. According to the evidence, the deceased heard a noise at his barn, and thought that his mare had got into the fodder. He went out there to see about it, taking with him a bridle and a lantern. A gun was heard fired, and the deceased came into his house, stating that he had been shot while at the barn. The deceased did not take his gun with him, so that it is certain that he was shot by some one else, and, as about stated, the attending circumstances show that the killing was done after deliberation and premeditation.

It is earnestly insisted that the deceased did not see who shot him, and that the defendant should not be convicted on the statement of the deceased to the effect that he recognized the defendant as the person who shot him, from hearing his voice. According to the dying declarations of the deceased, when he approached the barn some one cried, "Now!" and then a gun was fired and the deceased was struck by the bullet from it. After the gun was fired some one said, "God damn him, I got him." The deceased recognized the defendant as the person who shot him after hearing him speak these words. The deceased had been well acquainted with the defendant, and it was possible for him to recognize him by his sense of hearing as well as by his sense of sight. A person may be recognized by his voice as well as by his appearance. Other evidence was introduced tending to corroborate the dying declarations of the deceased.

It appears that the deceased was a school director and had taken the part of a lady school-teacher in a quarrel with the Cranfords, whose children were pupils at the school. This resulted in bitter feeling between the two families. While the defendant had formerly worked with the deceased and they had been good friends, at the time of the killing he was living with the Cranfords and working for them. He took sides with the Cranfords in their quarrel with the Roberts family. On the Sunday

preceding the killing on Saturday night, a neighbor saw the defendant and one of the Cranford boys riding along the road, talking pretty loud. They appeared to be drunk, and the defendant said, "God damn him, we'll get him some night; we'll fix him so he won't be no witness against us." While the defendant did not state in this connection to whom he had reference, the jury might have inferred that he was talking about the deceased. Later on the same day the defendant and Cranford purchased some shells.

Therefore, the dying declarations of the deceased, together with the surrounding circumstances as detailed above, were sufficient to warrant the jury in finding the defendant guilty of murder in the first degree.

It is next insisted that the court erred in admitting certain testimony relative to the quarrel between the mother of the deceased and the lady school-teacher on the one side, and the Cranford children on the other, which occurred a few days before the killing. The record shows that the defendant was present when this difficulty occurred and took sides with the Cranfords, and we do not think there was any error in admitting the testimony.

It is more earnestly insisted that the court erred in admitting testimony relative to another quarrel between the teacher and the Cranford children at which the defendant was not present. We think this evidence was admissible upon the theory that the defendant and the Cranfords had conspired to kill the deceased. The proof of such conspiracy is a preliminary question to be passed upon by the court, and where the evidence offered is sufficient to make a *prima facie* showing of the existence of such conspiracy, then evidence of all the acts and declarations of each conspirator are admissible against his co-conspirator. *Cantrell* v. *State*, 117 Ark. 233. The evidence shows that bitter feeling had arisen between the Roberts family and the Cranfords on account of a quarrel between a lady school-teacher and the Cranford children. The deceased was one of the school directors,

and took the side of the lady teacher. The defendant at the time lived with the Cranfords, and took their side of the quarrel. The quarrel became so bitter that each side endeavored to have the other arrested, and the head of the Cranford family went so far as to state that he would no longer try to keep peace between the two families, but would like to see some of the Roberts family killed. All these circumstances show the existence of a conspiracy and renders admissible the testimony alluded to. The testimony tended to establish a motive for the killing, and was admissible as acts and declarations leading up to the killing as a result of the conspiracy.

The next assignment of error is that the court could not lawfully proceed to judgment and sentence upon the verdict. The form of the verdict is as follows: "We, the jury, find the defendant guilty and place his punishment for life in the State Penitentiary."

Reliance is placed by counsel upon the case of *Banks* v. *State,* 143 Ark. 154. There the defendant was indicted for murder in the first degree, and the jury returned a verdict of "Guilty as charged in the indictment," without anything more. Following its previous decision, the court held that the verdict was fatally defective. The reason given was that the statute expressly requires the jury to ascertain the degree in all cases of murder, and that its terms are imperative. The section of the statute referred to is 3205 of Crawford & Moses' Digest. Sec. 3206 provides that the jury shall have the right in all cases where the punishment is now death by law to render a verdict of life imprisonment in the State Penitentiary at hard labor. This act gives the jury the right to fix the punishment of a defendant found to be guilty of murder in the first degree at life imprisonment instead of death. Before the passage of the act there was but one penalty for murder in the first degree, and that was death. The language of the act makes the punishment a part of the verdict. The statute gives the jury, and not the court, the right to reduce the punishment. The fixing

of the punisment must necessarily, then, be a part of the verdict. See *Webb* v. *State,* 154 Ark. 67.

The indictment in this case was for murder in the first degree. It is true that the indictment contained a charge of all the lesser degrees of homicide, but the jury could only fix the punishment at imprisonment for life in the State Penitentiary for murder in the first degree. The defendant having been indicted for murder in the first degree and the statute having required the jury to find the degree of the offense, coupled with an express finding of the jury that the defendant was guilty and his punishment fixed at imprisonment for life in the State Penitentiary, showed that they found the defendant guilty of murder in the first degree and reduced his punishment to life imprisonment, as they had the right to do under the statute. Therefore, this assignment is not well taken.

The next assignment of error is that the judgment should be reversed because the defendant was tried before the case of his codefendant was finally disposed of. The defendant and John Cranford were jointly indicted for the murder of Elijah Roberts. They elected to put John Cranford on trial first. This was done, and the jury in the Cranford case was discharged because it could not agree upon a verdict. The defendant was then put on trial over his objections. It is insisted by counsel for the defendant that under the statute he could not be placed upon trial until the case against John Cranford had been finally disposed of.

The section referred to is 3140 of Crawford & Moses' Digest, which provides that in felony cases defendants jointly indicted may elect the order in which their cases shall stand upon the docket for trial.

In *Sims* v. *State,* 68 Ark. 188, the court held that this statute does not contemplate that a defendant jointly indicted shall not go to trial until final disposition has been made of the case against his codefendant which stands first on the docket for trial. The court said that

the statute fixes only the order in which the cases of defendants jointly indicted shall be called for trial after they have severed. Therefore we hold that this assignment of error is not well taken.

Finally, it is insisted that the court erred in refusing to give certain instructions asked by the defendant. We have examined the instructions given by the court and think they fully and fairly submitted the respective theories of the State and of the defendant to the jury. The requests of the defendants refused by the court were either covered by the instructions already given, or were argumentative in form. Therefore no error was committed by the court in refusing to give them, and we do not think it is necessary to set out the instructions and discuss them separately.

We find no prejudicial error in the record, and the judgment will be affirmed.