LOWMACK *v.* STATE.

Opinion delivered January 21, 1929.

*H. W. Applegate,* Attorney General, and *Effie Combs,* Assistant, for appellee.

KIRBY, J. This appeal is prosecuted by appellant from a judgment of conviction of murder in the first

degree, with a sentence of life imprisonment imposed for killing his wife, Etta Lowmack.

It appears from the testimony that appellant, who was separated from his wife, had attended an ice-cream supper at the St. Paul Baptist Church, where she was also present on the evening of the shooting. About 10:30 P. M. the deceased, who was rooming with Cora Poe, a block or two distant from the church, left the place, running, one witness said, after Ross Bryant came and told her that Lowmack was going to kill her. Shortly afterwards two pistol shots were heard, at an interval of a minute or two apart, and a woman's voice screaming, "Oh Cousin Mary! Come and get me. Lowmack has shot me!" Witnesses went to the place of the shooting, and brought deceased to Inez Cooper's back porch. She had two bullet wounds. One bullet had lodged in the brain, and she said she was going to die, and was suffering greatly, and asked Inez Cooper to finish killing her, and she knew she was going to die. She was shot Saturday night, and lived until the next Tuesday, July 24. She inquired of this witness later, at the hospital, on the day she died, whether they had got Lowmack, and upon being informed that they had not, said: "Are they going to get him? I wish they would, 'cause he shot me." She said further that Lowmack called her to come to him, and dragged her with him into the bushes by the side of the road, had sexual intercourse with her, and, after getting up, asked if she was going to come back to him, and when she said "No," shot her. That she then called Mary Hodge, her cousin, and told her that Lowmack had shot her. Said she was in front of Cora Poe's house, where she was rooming, when appellant called her to come on with him. This statement was made about 10:30 in the morning, and deceased died at 4 o'clock in the afternoon, and was conscious all the while until her death. Deceased was shot about a half block from Inez Cooper's house, and maintained at all times after she was shot that she was going to die.

Several witnesses heard the shots and heard deceased screaming for "Cousin Mary," and stating that "Lowmack had shot her." The next morning witnesses went to the place of the shooting, and found the hat and shoes of the deceased, Etta Lowmack, a bloody handkerchief, and two empty pistol cartridge shells.

Cora Poe testified that her husband was Etta Lowmack's cousin, and that Etta roomed with them; that she saw the defendant at the ice-cream supper, and a little later Etta got some cream, and that she went home. Did not hear the shots, but, after being informed about it, met the men coming from the woods with Etta. That she said she could not live; asked them not to wash her face, but to finish killing her and get her out of pain; that she knew she could not live. Witness knew that Etta had been afraid of Lowmack, and asked why she went with him. She replied, "He called me, and told me to come there and go with him, that he wouldn't hurt me." When she got there he grabbed her by the hand and dragged her out into the woods. Said she was coming to my house, and was nearly there, was on the grass on the edge of the yard, when he called her. Witness had heard defendant say to her, a week before the killing, "If you don't take me back, I'll kill you."

Appellant testified that, after he left the ice-cream supper at the church, he went up the hill to a dance, where he stayed until about 10 oclock. He came down the hill and met his wife, who had told him before dark she wanted to see him; met her not far from Cora Poe's house, and she told him to wait there a minute. She went into the house, where she was staying, and came back with her hand in the bosom of her dress, and said, "I have got a lot to tell you." She then went over and sat down, and said to him, "Sit down," to which he replied he didn't want to. She then said she wanted $50, and he replied he did not have it. At that time somebody threw a rock and hit close to him, and she sprang up towards him, and he knocked her back, and shot her, threw the pistol down and ran. He thought

she had a gun, and as the rock fell she sprang up, and he shot as she sprang up, and knocked her back, and shot again. Knocked her back with his hand both times. She dropped something, and he turned and ran. Never saw what she had. Said he was afraid of her, as she had shot him once, but was not mad when she shot him, and he lived with her a month and a half after that. Then she went to Cora Poe's. Tried to get her to live with him, but she wanted to stay there, and he and Cora could not get along. He had never had any intention of killing his wife. He followed her because he was afraid of her, and knew she carried a pistol and an ice pick. After the shooting he caught a freight train to Malvern. Went to Gurdon, and from there to Prescott. Stayed with his brother at Prescott two days, and went to the jail and gave up. Ed Johnson told him, a week before the shooting, that deceased had gone to McElroy's, and said she wanted a pistol to kill appellant. Denied saying that he would kill his wife if she would not live with him, and denied Leola Moseby was with her before he met her the night of the shooting.

Leola Moseby had testified that she left the church and started up the hill with Etta Lowmack, going home, when her husband called her, saying, ''Come back, I'm not going to hurt you,'' and she went to him.

The court instructed the jury, giving the usual instructions in murder cases, and giving all the instructions asked by defendant, and from the judgment on the verdict against him this appeal is prosecuted.

No brief has been filed for appellant, who was defended by attorneys appointed for the purpose, and the evidence is sufficient to support the verdict.

The only questions raised were as to the admissibility of the testimony of appellant about a former conviction, and of dying declarations. All the witnesses stated that the declarations made by the deceased were made in the belief of approaching death, and after she had stated she was going to die, and no testimony whatever tended to show that she had made any other statements about or

expected any other result from her wound. Some of the witnesses stated she said she was going to die, before making the statements relative to the shooting and how it came about, without objection made to it. All of the testimony showed, however, that she maintained at all times that she would not get well, and that she had the last conversation with Goldie Danner about 10:30 of Tuesday morning after the shooting on Saturday night, and died about 4 o'clock that afternoon, and remained conscious until her death. The statements were made by deceased after she was shot relative to the circumstances under which she was wounded, and under a sense of certain and impending death, which followed shortly thereafter, and were properly admitted as dying declarations. *Freels* v. *State,* 130 Ark. 189, 196 S. W. 913; *Stewart* v. *State,* 148 Ark. 540, 230 S. W. 590; *Burns* v. *State,* 155 Ark. 1, 243 S. W. 963; *Hudson* v. *State,* 168 Ark. 634, 271 S. W. 3.

The statements of some of the witnesses relative to the matter were made without objection, and objections and exceptions only would not avail, not having been made at the time of the introduction of the testimony. *Vaden* v. *State,* 174 Ark. 950, 298 S. W. 323; *Clardy* v. *State,* 96 Ark. 53, 131 S. W. 46; *Seaton* v. *State,* 151 Ark. 240, 235 S. W. 794.

Neither was error committed by the court in permitting appellant to be asked, on cross-examination, while testifying in his own behalf, if he had not been convicted for disturbing the peace. *Turner* v. *State,* 100 Ark. 199, 139 S. W. 1124; *Hunt* v. *State,* 114 Ark. 239, 169 S. W. 773.

The court gave all the instructions requested by the defendant, and as requested, and after a careful examination of the instructions given we do not find any error in them. No specific objections were made to instructions requested for the State, and in the motion for a new trial error is assigned only in the giving of "instruction Nos. 1 to ........... inclusive," which is not sufficient to require examination and review of any of the instructions but that numbered 1. The case being a capital one, how-

ever, all the instructions have been considered as already stated. It is true there was no instruction given on the question of dying declarations, but none such was asked, and appellant, if he desired an instruction on a particular point he regarded not covered by the instruction given, should have requested a correct instruction thereon. *Lackey* v. *State,* 67 Ark. 416, 55 S. W. 213.

We find no prejudicial error in the record, and the judgment is affirmed.