BLACK v. STATE.

4562

Opinion delivered June 20, 1949.

Rehearing denied October 3, 1949.

 

*Robert J. Brown, Joe W. McCoy, W. H. Glover* and *Carl Langston,* for appellant.

*Ike Murry,* Attorney General, and *Jeff Duty,* Assistant Attorney General, for appellee.

FRANK G. SMITH, J. Appellant was put to trial upon an information charging him with the crime of murder in the first degree, alleged to have been committed in the perpetration of the crime of rape upon the person of Betty Jane McCall. He was found guilty of the offense charged and was given a death sentence, from which judgment is this appeal.

Appellant moved to quash the jury panel upon the ground that no female was on the jury. It was shown that although the number of women who were qualified electors eligible for jury service in Pulaski County, where the case was tried, was nearly as large as the number of

male persons eligible for jury service, no woman had been selected for jury service in the criminal division of the circuit court for a long number of years and none had served as jurors in that division of the circuit court. An exception was saved to the action of the court in overruling the motion to quash the panel.

The identical question here raised was presented in the case of *Bailey v. State,* ante, p. 53, 219 S. W. 2d 424, which like the instant case came up from the Pulaski Circuit Court, and what was said there is controlling here. After a review of the authorities, which we do not repeat, it was there said:

"We think the inference deducible from the Fay case (332 U. S. 261, 61 S. Ct. 1613, 91 L. Ed. 2043), is that where a State does not impose upon women as a class the inescapable duty of jury service, a defendant who complains that due process was denied, or that he was not afforded the equal protection contemplated by the Fourteenth Amendment, must show something more than continuing failure of jury commissioners to call women for services in a division of the Court where the innate refinement peculiar to women would be assailed with verbal expressions, gestures, conversations and demonstrations from which most would recoil."

Miss McCall, an unmarried woman, was killed on the night of the 23rd of September, 1948, at some hour between 1:30 a. m., and 4:00 a. m. The undisputed testimony shows that Miss McCall, who was employed as acting director of nursing education at the Veterans Hospital at Ft. Roots, near Little Rock, drove her car to a filling station where appellant was employed in the city of Little Rock, for battery service, and while the service was being rendered an engagement was made for appellant to escort Miss McCall to a night club where they might engage in dancing. They had never met before. Miss McCall gave appellant her address and telephone number, and on the following Wednesday he called her on the phone and she agreed to come for him at his place of business in her car. She did so, and upon her arrival appellant took the wheel and thereafter did all the driving.

They started to a suburban night club. On the way appellant bought a bottle of whiskey. When arrested he told the officer who arrested him that he had bought a pint of whiskey. At the trial he testified that he bought a bottle containing 1/5th of a gallon.

They were accompanied to the night club by appellant's roommate, a young man named Jimmy Wells, and his companion, a young lady named Miss Mills. Appellant introduced this couple to Miss McCall as they had never met before. The four drove to the night club where appellant secured ice and prepared drinks, but only he and Miss McCall drank. The other couple did not drink. There is some question as to whether Miss McCall drank, but we think the fair implication is that she did.

After drinking and dancing for a time, Miss McCall broke the strap on one of her shoes, and the party returned to town, leaving Wells and Miss Mills at a service station where Wells was employed. Appellant and Miss McCall drove to Miss McCall's apartment. Her roommate testified that Miss McCall arrived there about 11:15 and after changing her shoes she and appellant returned to the night club. The last person testifying in the case who saw deceased alive was the band leader at the night club, who knew appellant and spoke to him and the band leader testified that appellant and deceased left the night club about 1:30 a. m. No other person testifying in the case, except appellant, thereafter saw her alive.

The next person who saw deceased at all was appellant's roommate, Jimmy Wells, who testified that he was awakened by appellant about 4:00 a. m., who told him that Miss McCall was in the car and he thought she was dead. Appellant asked Wells if he should drive to a hospital, but when Wells saw that Miss McCall was dead, he told appellant to drive to the police station, which appellant did.

Upon reaching the police station the police saw the dead body of Miss McCall lying with her head in the window of the car. The police arrested appellant and called

the Prosecuting Attorney, and the deputy prosecuting attorney came, with a young lady stenographer who reported stenographically all that was said after her arrival. The deputy prosecuting attorney asked appellant if he wished to make a statement, and advised him that anything he said might be used against him. He was not asked if he wanted to see an attorney before making his statement.

The undisputed testimony is that appellant's statements were made freely and voluntarily and without duress, threats or promises of any kind. The statement was not in the nature of a confession, but was a narrative of what had occurred between appellant and deceased. He admitted that he had sexual intercourse with deceased, but said it was with her assistance, and he denied any intention of killing deceased. Asked if deceased resisted him, he stated that she did for a time, but that he "got it."

The stenographer had transcribed her notes, and the deputy prosecuting attorney had the transcription thereof in his hand while cross-examining appellant. Objection was made and overruled to the use of these notes. Had a confession been shown, it would have been improper to introduce any part thereof without introducing the whole statement; however, the deputy prosecuting attorney in his examination of appellant offered to submit the transcription to appellant's attorney, which offer was declined. The principal use of the transcription was to ask appellant if he had made certain statements disclosed by the transcription, some of which he admitted, while others were denied. The testimony on the part of the state was to the effect that appellant had made at the police station certain statements which he denied having made while testifying as a witness at the trial. We think this cross-examination was entirely proper and permissible.

Objection was made to the introduction in evidence of a pair of trousers which appellant admitted were his, on which blood was found. Appellant admitted that when he went to his room to advise with his roommate he had

changed his trousers, and that the trousers which he had changed and which were found on his bed were his.

When appellant first drove up to the police station a picture of deceased in the car was taken. The body was then carried to the undertaker where other pictures were made. Objection to the introduction of pictures was made upon the ground that they were taken by one person and developed by another, but it was shown that the pictures developed were those taken and correctly revealed the body of the deceased when they were taken. Objection was also made that the pictures were so gruesome as to arouse and inflame the jury and that their introduction added nothing to the testimony of witnesses who described the location and condition of the body.

We think, however, no error was committed in permitting the introduction of the pictures. They told a story which the testimony of witnesses could not well have described. There was a hiatus in the testimony as to just what happened between 1:30 a. m., and 4:00 a. m., and these pictures told a story conflicting with such explanations as appellant vouchsafed. They reveal deceased's ordeal during that time, and discredited appellant's statement that he had sexual intercourse with the assistance of deceased. Witnesses who heard appellant's statement at the police station testified that appellant said he and deceased had two fights, one when they first stopped the car and while having intercourse they had another fight. They had two fights, one before they had intercourse, and the other while they were having it. Witnesses for the State testified that appellant did not appear to be intoxicated while making these statements.

The officer in charge of the State Police Laboratory testified that he had made tests of clothing which evidence showed had been worn either by appellant or by deceased, and that he found blood on the man's trousers and on his shirt, and that he also found blood spots on the lady's suit shirt and on her pants or step-ins which had not been removed from her body.

Appellant testified that he had been making love to the deceased all during the evening and while riding in

the car where the intercourse was had, and that while at first she repulsed him that later she assisted him. He testified that he became angry when deceased bit his hand, and he exhibited scars showing that she did bite him, but the jury was not unwarranted in finding that the woman was offering such resistance as she could. The pictures show that deceased was bruised all over her face and body, and that she had bled profusely from her wounds. The State's testimony was that appellant was asked, "When did you quit hitting her?" And he answered, "She kept begging me to stop and I finally did and she sat back upon the seat and leaned her head on the door" and she was in that position when appellant drove to the police station.

A police officer testified that he arrived at the station about 4:25 on the morning of September 23rd, at which time deceased's body had been removed from the car. Witness examined the car and found one of deceased's shoes on the right hand side of the car. Another shoe was directly up in front of the floor board, and he found buttons on the floor board of the car, and a lady's wrist watch on the right hand side of the car on the floor board in the back of the car.

The head of the department of Pathology at the University of Arkansas Medical School, performed an autopsy, at the request of the coroner, at 10:00 a. m. on September 23rd. He testified that the body revealed numerous bruises below the skin, and most apparent were those on the right and left forearm and left leg and over the pubic bone, and over the head and face and neck. That there was a large hemorrhage over the left eye, and a large cut over the left eye, about an inch or an inch and a half in length, and the examination revealed a small wound in the forehead. There were bruises over the whole body, but particularly on the arms and legs, and that an examination of the brain disclosed a small area of hemorrhage, indicating a blow to the head, and that they found that the thyroid cartilage was shattered and the vocal cords were swollen shut. He further testified that deceased's hands showed a great many

marks of injury, finger nails, or marks of struggle on the left and right hands.

The coroner himself, a practicing physician, who participated in autopsy, testified that the removal of the windpipe disclosed that it had been crushed and the edema or swelling had caused an obstruction where no air could get in, that the deceased had died of suffocation due to an injury to the windpipe.

That the deceased was guilty of a great indiscretion in making and keeping her appointment with appellant admits of no denial, and the jury's verdict reflects that she paid with her life for the indiscretion. That appellant had carnal knowledge of the deceased is a fact which he admitted, and the recited testimony supports the finding of the jury that this was not a matter of mutual sexual gratification or the result of consent, or of her assistance as appellant stated. If appellant killed deceased in the attempt to rape her, although he had no intention of killing her, he committed the crime of murder in the first degree. Section 2969, Pope's Digest, so provides. The testimony recited fully warranted the jury in arriving at the conclusion.

Evidence was offered as to appellant's good moral character, and other testimony was offered by the State to the effect that his reputation for morality was not good. There was testimony also that appellant had been fined for the commission of certain misdemeanors, one for drunken driving. This testimony was admitted and limited to the consideration of appellant's veracity as a witness, and was admissible for that purpose. *Lowmack v. State,* 178 Ark. 928, 12 S. W. 2d 909; *Shinn v. State,* 150 Ark. 215, 234 S. W. 636; *Smith v. State,* 74 Ark. 397, 85 S. W. 1123; *Younger v. State,* 100 Ark. 321, 140 S. W. 139.

The motion for a new trial was accompanied by a petition signed by 8 of the 12 members of the trial jury, asking the court to reduce the death sentence to a life sentence, or to grant a new trial. Conceding that the court had this power, its exercise was a matter within the

discretion of the court and under the facts disclosed by the record in this case we are unable to say that there was any abuse of this discretion.

Finding no error, the judgment is affirmed.

Justice GEORGE ROSE SMITH not participating.