WILLIAM ARCHIE MAYFIELD, JR. *v.*
STATE OF ARKANSAS

5518                                    458 S. W. 2d 725

Opinion delivered October 12, 1970
[Rehearing denied November 9, 1970.]

*Murphy, Carlisle & Taylor,* for appellant.

*Joe Purcell,* Attorney General; *Milton Lueken,* Asst.
Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant William Archie
Mayfield, Jr., was charged by information with first
degree murder in the killing of Sheriff Orval Bishop
in Green Forest, Arkansas, on July 14, 1969. On a
plea of not guilty, trial was commenced on December
3, and concluded on December 10, 1969. The jury re-
turned a verdict of guilty of murder in the second de-
gree but could not agree on punishment. On Decem-
ber 16, 1969, appellant was sentenced by the court to
15 years in the state penitentiary. For reversal appellant
relies upon the following points, to-wit:

I. The systematic exclusion of women from the jury panels.

II. The failure of the court to instruct the jury on voluntary and involuntary manslaughter.

III. The court improperly read only one instruction when the jury requested further definition of second degree murder.

IV. Evidence of statements made by Appellant immediately after the alleged crime were improperly admitted into evidence.

The facts show that appellant and his ex-wife, Clarice, had had domestic difficulties which resulted in an uncontested divorce on June 3, 1969. Mrs. Clarice Mayfield and her two children, a boy 9 and a girl 10, lived in a downstairs apartment at the Boostrom Apartments in Green Forest. On Friday before the shooting she had told Mrs. Pat Harris, an upstairs neighbor, that if she heard any noises to please come down and check about it. In doing so Clarice explained that she and her husband were having some domestic problems.

Pat Harris said that about 9:00 P. M. on July 14, 1969, she and her husband John were sitting out on the balcony of their apartment when they heard noises downstairs. After hearing a scream from the Mayfield apartment they decided to go downstairs together to see if Clarice needed help. When her husband knocked, Bill Mayfield answered the door and told John to mind his own business, that it was a family fight. There was a chain on the door. At the same time Clarice said she wanted out of there or to get Bill out of there, that she didn't want to stay with him. Pat went across the street at the suggestion of her husband to call the police. After Sheriff Bishop arrived she heard the sheriff ask Bill to come out, that he wanted to talk to him. According to this witness, the sheriff's tone was friendly. Her testimony is that she and John were on the stairs when they heard Clarice say, "Lookout, he's got a gun"

—then they heard a shot and ran upstairs where they heard more shots, then a pause, then one more shot —*i. e.,* three groups of shots. After the shooting Pat and her husband went down stairs. She said she could see inside the door and Bill was lying on the floor, but she couldn't see Clarice. When they came back in from the yard where she saw Sheriff Bishop, the chain was still on the door but the woodwork was pulled loose a little. She pushed the door and went on in—she could hear Clarice moan but couldn't see her as she was behind the door. She noticed Bill laying in the center of the room. He was saying to himself that he had shot Orval, he had shot Clarice and he had shot himself.

John Harris's testimony is essentially the same as Pat's, except that he added, after Pat went across the street to call the sheriff, Bill opened the door and asked whether she had gone to call the sheriff. John, not wanting to become involved, lied and told him that she had not. However, Bill a second time opened the door, made the same inquiry and got the same answer.

The testimony of Mrs. Bishop and Dr. Anderson Nettleship clearly discloses that Sheriff Bishop was shot as a result of the shooting that had occurred and that Sheriff Bishop died from the shooting.

Clarice Mayfield testified that Bill called her on the evening of July 14. He wanted to know if she would go out with him the next night and also if he could come by. She said she told him no. Later, however, he appeared at the back door of the apartment with some clothes of their boy. She was terrified and told him so and also told him not to come in. However, he did come in. Their little boy greeted and hugged him. Then Bill told the boy that he was going to get something straightened out between Clarice and Boyd Smith, and sent the boy upstairs to the Harris apartment. After locking all the doors from the inside, he asked Clarice to call Boyd Smith. When Clarice protested he showed her the gun and that it was loaded and said, "We're going to make that call". She said that she was too

nervous to find Smith's phone number but Bill found it and dialed, and she did the talking. At one time she started to edge toward the door but Bill pointed the gun at her, so she stopped. About then someone knocked on the door. Bill went to the door and saw John and Pat Harris. Bill told them it was a family discussion and to go away. At this time Clarice told John she didn't want Bill there. Later Bill surmised Pat had gone to call the police and told Clarice to tell the sheriff that it was a family discussion, for him to stay out of it, if not Bill was going to kill the sheriff. According to Clarice, Bill answered the door when the sheriff knocked and did not take the chain off. After Bill had told the sheriff that it was only a family discussion, the sheriff told Bill, "Let's talk this over." The sheriff also asked Clarice if she wanted Bill there and she said "No". When she told the sheriff that Bill had a gun, Bill took the gun out of his belt and shot through the door. He then shot Clarice and started shooting himself. The shot numbed her leg and she fell to the floor.

The story of appellant does not vary substantially from that of the other witnesses up until the time of the shooting. He explained his possession of the gun in that he was a gun dealer and the gun had been sold and was supposed to be delivered. He had it in a holster under the seat of his pick-up truck. When he turned in to his wife's apartment it may have slid out from under the seat. He supposed that while he was getting the boy's clothes he might have stuck the pistol in his pocket. At any rate, he laid it on the table when he walked in the house. He admitted that an argument was going on when the sheriff asked him what's going on and that he said nothing. At the time he had the gun and was not going to leave it there after his argument with his ex-wife. He supposed that he might have been holding it in his hand. About that time the sheriff said, "Why don't we go talk about it", and Bill said, "O. K.". As the door chain was latched he pushed the door so that he could get the chain off, then Clarice said, "Look out he's got a gun." She hit his arm, grabbed his hand and the gun went off hitting his finger. Bill

said he had the pistol in his hand and couldn't turn loose of it—*i. e.,* he had his finger in it. Clarice got hold of it and twisted and it went off again. He didn't know where the first shot went but the second shot hit Clarice. When she folded over he thought she was dead so he shot himself once. After that he fell and everything was black. He was in pain and his eyes were closed, but it was light, someone had turned the lights on. He heard noises like a door and there was an echo of shots. At this time he didn't have any idea where the sheriff was. The next thing he remembered was when Deputy Sheriff Leo Sellers arrived.

POINT I. The three jury commissioners admittedly and intentionally selected no women jurors for the term in which they knew this case was to be tried. The reason therefor is set out by Commissioner Raymond F. Callon who stated that he excluded women from this panel because he was trying to save them from embarrassment. He explained that there might be one or two on the jury and the jury would have to be kept together all night and the commissioners were trying to excuse women on that account. Furthermore, the commissioners correctly understood that under our law a woman does not have to serve and may be excused on her own caprice or whim. The record reflects that the jury was in fact sequestered the nights of Dec. 8 and 9, with some problems about their accommodations.

Appellant obviously was not a member of the class excluded. Under our decisions in *Bailey* v. *State,* 215 Ark. 53, 219 S. W. 2d 424 (1949); *Black* v. *State,* 215 Ark. 618, 222 S. W. 2d 816 (1949), cert. den. 338 U. S. 956, 94 L. ed. 590, 70 S. Ct. 490; and *State* v. *Neff,* 169 Kan. 116, 218 P. 2d 248 (1950); appellant has no standing to challenge lack of feminine influence on a jury.

POINT II. The trial court here instructed the jury on first degree murder, second degree murder and homicide by misadventure. Under the testimony of appellant and his ex-wife, appellant either intended to shoot the sheriff or the shooting was done by misad-

venture. We can find nothing in the evidence to warrant the giving of an instruction on voluntary and involuntary manslaughter.

POINT III. The record shows that after the jury had deliberated some time it returned into court and requested the definition of second degree murder. Whereupon the court proceeded to read the instruction given on second degree murder and to explain the difference between first degree and second degree murder. This procedure was approved in *Harrison* v. *State,* 200 Ark. 257, 138 S. W. 2d 785 (1940), and appellant has furnished no reason for our overruling such authority.

POINT IV. Appellant here argues that the trial court erred in permitting four witnesses to testify that appellant told them that he shot Orval, shot Clarice and shot himself. We find the contention without merit for two reasons: (1) The witnesses testified that Mayfield was conscious and knew what he was saying, and (2) the alleged error was not properly brought forth in the motion for new trial.

Affirmed.