RAND *v.* STATE.

4977                                                                341 S. W. 2d 9

Opinion delivered December 12, 1960.

*Claude Duty & Jeff Duty,* for appellant.

*Bruce Bennett,* Attorney General, by *Thorp Thomas,* Asst. Attorney General, for appellee.

JIM JOHNSON, Associate Justice. The appellant, Virginia Rand, was charged with the crime of second degree murder for the killing of Harry V. (Buddy) Clark. Following trial in the Benton Circuit Court, the jury found appellant guilty and fixed her punishment at 8 years in the state penitentiary. From such verdict comes this appeal.

It appears from the record that on the evening of August 8, 1959, the deceased, Clark, and his wife entertained Mr. and Mrs. Sam Davis in their home. At about 1:15 a.m. on August 9, Mr. and Mrs. Davis left the Clark home and at the same time Clark left in his car to check the receipts at the Horseshoe Grill, a cafe which he owned located some 8 blocks from the Clark home in Rogers. Although the evidence is somewhat uncertain, it is clear that Clark finished his work at the cafe and at 1:30 a.m. the night police radio operator received a

call from a woman identifying herself as appellant who said: "Send someone out here, I have had some trouble." After the radio operator sent a patrolman to the Rand home, the appellant called again and said: "I have shot a man. I shot Buddy Clark." Upon arrival at the Rand home, the patrolman was told by appellant that she shot Clark in her bedroom. The patrolman immediately went to the hospital where he found Clark on the floor in the hall. Nurses at the hospital testified that Clark came in the front door and fell to the floor. The records show he was admitted at 1:45 a.m. He expired at 4:17 a.m. that same morning.

The patrolman testified he found tracks in the heavy dew going in and out of the Rand house and found a gun about 4 to 6 feet from these tracks. There were two bullet holes in the bedroom walls and 5 empty cartridges were found in the bedroom. The deceased was shot 4 times—3 times in the chest and one time in the right arm. No trace of blood was found in or around the Rand house but there was blood on the steering wheel and door of Clark's automobile.

The motion for a new trial contained 66 assignments of error which we have examined in detail. The evidence related above, standing uncontradicted and unexplained, was sufficient to justify a conviction. Ark. Stats. § 41-2246. The killing was admitted by defendant, and the use of a deadly weapon, capable of producing death was admitted. We have repeatedly held that malice, and intent to kill, may be implied from the use of weapons capable of producing death. Specific intent to take a life is not an essential element of the crime of murder in the second degree. See: *Wooten* v. *State*, 220 Ark. 750, 249 S. W. 2d 964, and cases cited therein.

A great deal of testimony was introduced by the State tending to show that there had existed for several years an extramarital relationship between appellant and deceased. The admissibility of this testimony is drawn in question. Without detailing the testimony of each particular witness, let it suffice to say that the evidence

wherein witnesses testified about seeing appellant and Clark together, including testimony of one following the other in automobiles, and the testimony establishing that Mrs. Rand called or contacted Clark, was entirely admissible.

On the other hand, the testimony of anonymous telephone calls was entirely inadmissible, as was certain evidence that strongly implied, though entirely speculative, that the two were having rendezvous. For instance, Eldon Maxey, a resident of Springdale, testified that he did not know Mrs. Rand or Clark, but that he had seen a man driving an old car and a woman driving an Oldsmobile, park in the parking lot in Springdale. Maxey stated that he rather thought the old car was a Ford, though he was unacquainted with the model. From his testimony:

"Q. It just come down like Fords do?

A. Yes. . . .

Q. Do you know whether or not that's the type, the model from 1941 to '48?

A. Yeah, it was a later car than a '48, a '38.

Q. I said a '48?

A. You said a '48?

Q. Was it between a '41 and a '48, or do you know?

A. No, I don't . . . I don't remember. . . ."

\* \* \*

"Q. A black car? How many such occasions did you observe that?

A. Just one time I reported."

The witness testified that he saw this couple get in the old car and drive west to the Legion Hut. "They was putting something up over the glasses so I reported to the police, to Herman McCullough." Herman McCullough testified that he was acquainted with Mrs. Rand, and following Maxey's report, investigated, and saw Mrs.

Rand in the Ford with *some man*. Neither of the witnesses identified Clark as being present at any time.

The court admitted into evidence two unsigned letters directed to Mrs. Clark, and three unsigned cards directed to acquaintances of Mrs. Clark. No proof was offered that these communications were sent by the defendant, though the contents of each clearly implied that they had been written by one having an affair with Mr. Clark. Mrs. Clark testified that after receiving these letters she almost had a nervous breakdown and went to Barnes Hospital to "find out what was wrong with me." This evidence relating to the letters was entirely inadmissible but further discussion of the contents is not required because the court subsequently withdrew these letters and cards from the consideration of the jury. One of the letters was very critical of personal items in the house, including the bedroom, and advised Mrs. Clark that ". . . I left a lipstick for you under the west end of the settee cushion." Mrs. Clark subsequently testified that she found a lipstick in that location, and this lipstick was offered in evidence at the trial. Velda Hudspeth, a close friend of Mrs. Clark, testified that the latter showed her the lipstick, and that on an occasion when appellant had visited in the witness' home, she observed Mrs. Rand's lipstick, and there was some similarity. From the evidence:

"Q. What was the similarity?

A. The lipstick was worn in the center.

Q. The one that she had?"

\* \* \*

"Q. Now, you're testifying to this jury that Mrs. Rand had a lipstick and it was worn somewhat like that; is that correct?

A. Yes.

Q. Did you ever see any other lipsticks worn like that?

A. I never noticed another woman wearing it like that.

Q. You never noticed another woman wearing it like that? And that's what you go on in your testimony here; what you base your testimony on here is that you saw lipstick similarly worn like that?

A. Yes.''

\* \* \*

''Q. Do women have a particular manner in which they apply lipstick which leaves a particular impression on—wears it a certain way on the stick?

A. I think so.

Q. How many lipsticks have you examined, Mrs. Hudspeth?

A. At the time, since I was interested, I watched other people's lipsticks to see if they were worn differently.

Q. I'm asking you at that time how many lipsticks had you examined?

A. I didn't examine any.

Q. You hadn't examined any at that time, had you?

A. I'd looked at them. I looked at them when I saw other women take them out. I was interested.''

This is a remarkable bit of evidence. With the thousands of women in this state who use lipsticks, it would certainly appear that more than one would have a lipstick ''worn in the center.'' Be that as it may, the witness was not testifying about an examination of a lipstick in the possession of Mrs. Rand; rather she was testifying about a lipstick which Mrs. Clark said she found in a location suggested to her by an anonymous letter (which, in itself, was inadmissible). All of this evidence relating to the lipstick was incompetent for the reasons herein mentioned.

In addition to this testimony, a large volume of evidence was introduced by the State tending to show animosity between appellant and the wife of deceased. Mrs. Clark testified that she kept her golf equipment in a locker at the Twin City Golf Club house, and that, about a year before, she had found two pairs of golf shoes, golf bag, and a golf club slit, apparently by a razor blade or knife. She stated that she left her key to the locker hanging on a board where anyone could have picked it up. Paul Watkins stated that he saw Mrs. Rand in the club house on the occasion when the equipment was damaged, though he could not say what time of day the incident occurred, nor could he say that no one was there except Mrs. Rand. This evidence was inadmissible since it did not relate to animosity or ill feeling toward the deceased, nor was the defendant connected with the act of damaging the property. In this respect, such evidence is distinguished from that deemed admissible under the ruling set forth in *Avey* v. *State,* 149 Ark. 642, 233 S. W. 765; and *Stokes* v. *State,* 71 Ark. 112, 71 S. W. 248, relied on by appellee.

Probably the most damaging inadmissible testimony which was permitted to go to the jury related to evidence concerning the kicking of Mrs. Clark by Mrs. Rand when the former was seven months pregnant. Mrs. Pete Elders testified that she attended a party in 1959 which was also attended by Mrs. Clark and the defendant. She stated that she was talking with the former, who was standing in front of her, and Mrs. Rand was seated on a high stool just to the right of the witness. From her testimony:

"Well, I was talking to Mrs. Clark when I felt something hit me on my right side, and I glanced down, because it was a blow and I seen this foot hit Mrs. Clark.

"Q. Do you know . . .?

Mr. Duty: Object to the testimony and ask it be stricken. Irrelevant, incompetent and immaterial.

"The Court: It will be overruled.

"Mr. Duty: Save our exceptions to the ruling.

"Mr. Coxey:

Q. Do you know whether that blow struck Mrs. Clark?

A. She had on a smock.

"Q. I say, do you know whether or not it struck her?

A. Well, I couldn't feel for her, but the foot disappeared under the smock.

"Q. Under her smock?

A. Yes."

Further:

"Now, you didn't see Mrs. Rand kick Mrs. Clark, did you?

A. I saw her foot.

"Q. I say, you didn't see Mrs. Rand actually in the act of kicking Mrs. Clark, did you?

A. Well, she had to be on the other end of the foot." The kicking was also testified to by Laney Clark. We can think of nothing that would tend to more inflame the mind of a juror than to hear evidence that a woman that far along in pregnancy was kicked in the stomach. Such an act by the defendant would be considered inexcusable, and we deem this testimony not only inadmissible, but also highly prejudicial; so much so that a reversal would be required though the other testimony herein cited was not included in the record. This evidence all tended to show that Mrs. Rand was a woman of "bad character", and Mrs. Rand's character had not been placed in issue. As stated in Wharton Criminal Evidence, Vol. 1, 11th Edition, p. 487, § 345:

"Evidence of other crimes, when offered in chief, violates both the rule of policy which forbids the state to initially attack the character of the accused and the rule of policy that bad character may not be proved by particular acts."

There can be no doubt that all this evidence was prejudicial to appellant. By its very nature, it creates in the eyes of the jury a damaging image. As we said in *Lentz* v. *State,* 169 Ark. 31, 272 S. W. 847.

"It is the well settled doctrine of this Court that the prosecution cannot resort to the accused's bad character as a circumstance from which to infer guilt, the reason being that 'if such testimony be admitted the defendant might be overwhelmed by prejudice, instead of being tried upon evidence affirmatively showing his guilt of the specific offense with which he is charged.' "

Reversed.

McFADDIN, J., concurs.

ED. F. McFADDIN, Associate Justice, concurring. It is with great reluctance that I agree to a reversal of this conviction; but a careful study of the record convinces me that I cannot place the stamp of judicial approval on the admission of some of the testimony that was used by the State over the objections of the defense. In *Byler* v. *State,* 210 Ark. 790, 197 S. W. 2d 748, we reversed a case because of error; and Judge FRANK SMITH in making the reversal quoted: " 'Twill be recorded for a precedent and many an error by the same example will rush into the state. It cannot be.' "[1] That is the way I feel in this case. While the testimony may not have influenced the jury in view of other evidence, still I cannot, by affirming this conviction, place the stamp of approval on such evidence so as to be used in another case.

I do not agree with the majority opinion. The testimony showing Mrs. Rand's conduct toward Mrs. Clark could have been admissible—if properly limited—to show Mrs. Rand's dislike of Mrs. Clark because Mrs. Rand was jealous of Mr. Clark. This would support the State's theory of motive. It was part of the State's claim that

---

[1] The quotation is from Shakespeare's "Merchant of Venice," Act IV, Scene 1, Line 220. It is in answer to the equally famous quotation: "To do a great right, do a little wrong."

Mrs. Rand killed Mr. Clark when he tried to end their relationship: "Hell hath no fury like a woman scorned."[2] The burden was on the defense to ask that the Court limit the purpose of the testimony to the one purpose for which it was admissible. See *Amos* v. *State,* 209 Ark. 55, 189 S. W. 2d 611. No such request was made, so I see no error duly preserved in regard to such evidence.

But, even so, there was other evidence admitted into this trial which was clearly inadmissible, as I will now detail:

### A.

On Transcript Page 406, when the witness Wanda Sly, a waitress in Buddy Clark's cafe, was testifying, the following occurred:

"Q. Now, you answered the phone, you say, on occasions. Did you ever answer the phone after it had rung and no one would answer and you'd hear them hang up?

Mr. Duty: That's objected to.

A. Yes.

Mr. Duty: That is objected to.

The Court: Overruled.

Mr. Duty: Note our exceptions."

The witness had been testifying as to telephone calls that Mrs. Rand made to Mr. Clark and in the quoted portion above, the Court allowed the witness to testify as to the phone ringing and somebody hanging up without answering. The quoted testimony was not admissible in evidence against Mrs. Rand and should not have been allowed because it was not shown that she had made such anonymous calls.

### B.

Mrs. Laney Clark, the widow of Buddy Clark, was called as a witness and she testified as to telephone calls

---

[2] The full quotation from William Congreve's play, "The Mourning Bride," Act III, Scene 8, is: "Heaven hath no rage like love to hatred turned, nor hell a fury like a woman scorned."

that she received from Mrs. Rand; and then on Transcript Page 670 the following occurred while Mrs. Clark was being examined:

"Q. Now, I ask you at this time, since you've had time to reflect, if you on any of those occasions when the phone rang and you heard noises, that you think of one now that you couldn't recall when I examined you previously?

A. Deep breathing.

Mr. Duty: Just a moment. Object to those. Those were the anonymous telephone calls without anyone identifying themselves. Object to the testimony of those telephone calls and ask the jury not to consider them.

The Court: It will be overruled.

Mr. Duty: Save our exceptions.

Mr. Coxsey: Q. All right, do you remember any more?

A. Deep breathing. Just sit there and hold the phone and just breathe real hard in the telephone.

Q. When did that occur?

A. Over a period of several months within the last year.''

There was nothing to show that this "deep breathing" was done by Mrs. Rand. So far as the record shows in this case these calls could have been the prank of a child; and yet such evidence was permitted to go to the jury against Mrs. Rand.

### C.

Again, Mrs. Laney Clark, widow of Buddy Clark, was recalled to the witness stand and permitted to testify that she had a locker at the Twin City Golf Clubhouse in which she kept her golf equipment; and on Transcript Page 695 *et seq.* this occurred:

"Q. I will ask you to tell the jury whether or not you sustained some damage to any of that equipment? If so, when?

Mr. Duty: Just a minute, Mrs. Clark. Object to that testimony, if the Court please. I could dream a thousand years and never dream up any connection between an injury to Mrs. Clark's golf bag and this case we're trying before this jury. This girl is not being tried for anything but this indictment here. There has been no connection shown between Mrs. Clark and Mrs. Rand and injury to a golf bag some time ago on a golf course at Rogers.

Mr. Coxsey: That's what we're endeavoring to do.

Mr. Duty: It has no connection with this case we're trying; only for prejudice. I object to that line of testimony.

The Court: Overruled.

Mr. Duty: Save our exceptions.

The Court: Order in the court room.

Mr. Coxsey: Q. What damage did you sustain to what articles?

A. Two pair of golf shoes, and my golf bag, and a golf club were slit with what looked like to be a razor blade or knife, and the golf cart was broken.

Q. And that was when?

A. Last year, last fall, a year ago this fall.

Mr. Coxsey: That's all.

Mr. Duty: If the Court please, I renew my objection to that testimony.''

There was not the slightest bit of evidence to connect Mrs. Rand with the damage that had been done to Mrs. Clark's golf equipment; and on cross-examination Mrs. Clark admitted that the key to her locker was, ''. . . available to any Tom, Dick, and Harry that wanted to walk in there. . . . Anybody could get that key and unlock it. . . .'' Nevertheless, the jury was left to surmise that Mrs. Rand *might have been the person* who

had damaged Mrs. Clark's golf equipment. Such unconnected evidence should never have been admitted.

### D.

Again, there was the evidence about the lipstick. The witness, Velma Hudspeth, was permitted to testify that Mrs. Laney Clark had shown her some lipstick and that the witness had seen some lipstick carried by Mrs. Rand which "seemed similar." There was never any identity of the lipstick. Such testimony was highly prejudicial.

I have listed these instances of incompetent evidence permitted over objection, so that when the case is tried again—as it will be, since it is reversed and remanded—the same mistakes will not reoccur. Of course, a whole group of unsigned and anonymous letters were originally admitted without any proof as to the handwriting to connect Mrs. Rand with the letters; and then later the Court excluded those letters. I cannot say that prejudicial error resulted since each member of the jury stated that he would disregard all such letters. Of course, on a retrial the letters will not be admitted without proper foundation proof.

As aforesaid, it is with great reluctance that I vote to reverse the conviction; but I am convinced that material and prejudicial error occurred in the admission of evidence.