Decker *v.* State.

5020 353 S. W. 2d 168

Opinion delivered January 29, 1962.

*Van Chapman* and *Jack Holt,* for appellant.

*Frank Holt,* Attorney General, by *Jack Lessenberry,* Asst. Attorney General, for appellee.

Carleton Harris, Chief Justice. William Eugene Decker was charged with first degree murder, the Information alleging that appellant murdered his wife, Nettie Jean Decker, on September 7, 1960. On trial, Decker was convicted of second degree murder, and sentenced to ten years imprisonment. From the judgment so entered, comes this appeal. In urging a reversal, appellant relies upon four points, which we proceed to discuss, though not in the order listed in appellant's brief. It is contended that the evidence was not sufficient to sustain a conviction of second degree murder, but we do not agree. Proof on the part of the State reflected that a man, identifying himself as Decker, telephoned Gale Williams,

deputy coroner, on the day of the killing, and informed Williams that he (Decker) had just shot his wife. The caller gave the location of his home, and the coroner went to the premises. He found a young white woman dead, and noted several gunshot wounds. His report reflected that she died of multiple gunshot wounds. Horace Wilson, a witness, who was not acquainted with either Decker or his wife, testified that he was in his potato patch, picking up sweet potatoes, when he noticed a cattle truck pass, which was being driven rather rapidly. The truck stopped at the Decker home, and a man went into the house. Soon, he came back out of the house, and appeared to be setting something down on the porch. The person then went to the truck, and thence back into the house. Shortly, Wilson heard three shots, and after a few minutes, two more shots. The man went out of the house, got in the truck, and drove away. Clifford Taylor, who operates a grocery store at Judsonia, testified that he had known Mr. and Mrs. Decker for about two months, and they were customers at his store; that the store was located about three hundred yards from the Decker home. He stated that about 3:15 in the afternoon, Decker came into his store, and said, "Call the ambulance and the sheriff. I have shot my wife."; that Decker had a gun, and gave it to Taylor at the latter's request. Decker called the sheriff, and told the witness, "If you will give me my gun, I'll go back and wait for the sheriff." Taylor returned the pistol, and Decker left the store. Bill Bogle, deputy sheriff, testified that he went to the Decker home, together with Pulley Bailey, Judsonia marshal. "I found Bill Decker sitting on a couch across from his wife. She was in a rocking chair, dead. He was sitting on a couch with a pistol by his side." A three or four year old child, crying, was present. An examination of the premises disclosed a trail of blood from the back kitchen door to the bedroom, and blood was there found around a rocking chair, a dresser, and under the bed. Bloodstains were also found on the curtain which separated the two rooms. Six or seven empty cartridges were located, and two lead slugs were taken out of the wall. The gun used

was a .22 caliber pistol, mounted on a .45 caliber frame. The child was taken to relatives in Bald Knob, and Decker was taken into custody. Subsequently, on rebuttal, Mrs. Carl Scott, a resident of McRae, testified that she saw Decker on the day he killed his wife, at "Dollie's Place", where he drank two bottles of beer; that Decker told her his wife had sued him for divorce, and he was under a restraining order not to go around her, but he was going to the home to see his children, and would shoot his wife if he had to. The evidence was sufficient to sustain the conviction for second degree murder, without the rebuttal testimony. See Section 41-2246, Ark. Stats. Also, *Wooten* v. *State,* 220 Ark. 755, 249 S. W. 2d 968, and *Rand* v. *State,* 232 Ark. 909, 341 S. W. 2d 9.

Appellant asserts that the trial court erred by permitting the prosecuting attorney to cross-examine appellant relative to statements which Decker had given to officers on the day of the shooting. It is contended that while no confession, as such, was introduced against appellant, questions asked relative to statements previously given should be placed in that category, and no proper foundation had been laid for the admission of a confession. Of course, a defendant in a criminal case who elects to testify is subject to impeachment like any other witness, and the purpose of the questioning was to establish that Decker had earlier made contradictory statements as to the circumstances of the killing. In *Brown* v. *State,* 231 Ark. 363, 329 S. W. 2d 521, the same contention was made. We held, quoting from earlier cases, *Black* v. *State,* 215 Ark. 618, 222 S. W. 2d 816, and *Hamm* v. *State,* 214 Ark. 171, 214 S. W. 2d 917, that there was no error in permitting the State to show the prior inconsistent statements. In the *Hamm* case, this Court said:

"Appellant was questioned by the Prosecuting Attorney after his arrest, and his answers were taken down by the Prosecuting Attorney's stenographer. * * * The stenographer was called to read her notes in contradiction of the testimony given by appellant at the

trial. It is permissible always to impeach the testimony of a witness by showing that he had previously made statements in conflict with his testimony."

Accordingly, this was not error.

For his third contention, appellant says that the court erred in refusing to give his requested instructions No. 3 and No. 4. We cannot consider the contention, for this matter was not noted as an assignment of error in the motion for new trial. It is well settled in this state that error cannot be predicated on the rulings of the trial court which were not assigned as erroneous in the defendant's motion for new trial. *Franklin* v. *State*, 153 Ark. 536, 240 S. W. 708, *Poe* v. *State*, 168 Ark. 167, 269 S. W. 355.

Finally, it is contended that the court erred in excluding competent testimony on behalf of appellant. This assignment referred to the proffered testimony of wit. ness Lewis Western before the court in chambers. There, counsel for appellant stated that Western, if permitted to testify, would state that on Monday afternoon, September 5th (two days before the shooting), he and his brother went with Mrs. Decker and a girl friend of Mrs. Decker's to the home of appellant and deceased, and while there, "Something was said about what would happen if Bill, the deceased's husband, happened to come in now." If permitted to testify, the witness would state that the deceased stated that, " 'If he comes in, I will shoot hell out of him.' " The court refused to permit the testimony. It is admitted that the threat was not communicated to Decker. Under the particular circumstances of this case, we do not think error was committed. Of course, it is well settled that a communicated threat by the victim against the accused is admissible to explain the conduct, or show motive of the accused, when self-defense is relied upon, or an overt demonstration of violence on the part of the victim is present. *Lee* v. *State*, 72 Ark. 436, 8 S. W. 385.

It is likewise true, that where the defendant relies upon self-defense, uncommunicated threats are admissi-

ble where there is doubt as to who was the aggressor, but this evidence is admissible solely for the purpose of bearing on this question. See *Parsley* v. *State,* 151 Ark. 246, 235 S. W. 797, and *Bell* v. *State,* 69 Ark. 148, 61 S. W. 918, *Lee* v. *State, supra.*[1]

The testimony relied upon by appellant as placing in issue the theory of self-defense is as follows:

"A. I went in the front door, the other doors were closed, and the air conditioner and the television was going and I walked in and my wife and Fred Davis were lying or sitting on the bed and he jumped up and run out the back door and I started to see who it was and she grabbed me and blocked the door and I slapped her and she grabbed the gun and I tried to take it away from her.

Q. Where was the gun?

A. On the kitchen table.

Q. At the time she grabbed the gun did she make any statement to you?

A. I said, 'Who was that?' and she said, 'None of your damned business.'

Q. That is what she said about this man?

A. Yes, sir.

Q. Did she say anything when she picked the gun up about what she was going to do to you?

A. Yes, sir, she said she would shoot me and I was trying to take the gun away from her.

Q. Did you ever at any time take the gun away from her and intentionally shoot?

A. No, sir, I did not.

Q. How do you account for the fact that she was shot?

[1] An interesting article is found in Ark. L. Rev., Vol. 5 (1950-51), p. 207, by Bob Hogan, entitled, "Evidence of Uncommunicated Threats in Excusable Homicide Cases." This article traces the development of the law in this state on the stated subject.

A. I don't know only just in the scuffle."

Further:

"Q. At the time your wife grabbed the gun off of the—was it the dresser in the kitchen?

A. No, it was a table.

Q. At that particular time were you doing anything at all, or attempting to do anything to her or offer any physical violence to her?

A. No, sir, I was not.

Q. At the time she grabbed it and said, among other things, that she was going to shoot you, when you reached her and wrestled with her, state whether or not what you did you did it with —

Mr. Henry: He is leading the witness again. I object..

The Court: Yes, sir, the objection is sustained.

Q. Why did you do, when she got the pistol, why did you do what you did?

A. Because I was afraid she would shoot me and shoot the kids too.

Q. In other words, if she shot you she would shoot the children too?

A. That is what I was afraid of, yes, sir."

The transcript reflects still further:

Q. You say she tried to get between you and him and he ran out the back door?

A. Yes, sir.

Q. You say you asked her who it was?

A. I asked her who it was and what was he doing there, or something, I don't remember just what I did say.

Q. I understood you to say awhile ago that you asked her who that was and what he was doing there and she said, 'None of your damned business.'

A.  I asked her who it was and what he was doing there and she said, 'It is none of your damned business.'

Q.  Then she grabbed up the gun?

A.  After I shoved her.

Q.  Where did you shove her, which direction?

I shoved her backwards and she went back against the table."

Subsequently he was asked the question, "Did you ever get the gun in your hands?", and answered, "I don't know."

In the average case of self-defense, both parties generally have a weapon, or it is contended that because of greater physical strength on the part of the deceased, the defendant was forced to use a weapon to protect himself from great bodily harm. Here, there is only the one weapon, and appellant testified that he did not know whether he ever obtained possession of the pistol; that he did not intentionally shoot his wife. Of course, if he obtained possession, there was no necessity to shoot her, for she was then unarmed. But if otherwise, we do not feel that appellant's testimony was such as to render the proffered proof of the uncommunicated threat admissible. It is apparent that his testimony itself is not completely consistent with the defense claimed, for it varies all the way from the contention that he shot her because he was afraid that she would kill him, and the children, to a claim that the killing was more or less an accident, occurring in the scuffle over the gun. The record also reflects that Decker, upon being arrested, told officers that his wife was trying to commit suicide, and in scuffling with her and endeavoring to take the gun away from her, the pistol discharged and killed his spouse.[2]

Let us keep in mind that the evidence excluded is *only* admissible as tending to show the probable aggressor—the person who committed the first act of aggres-

[2] The pistol was fired six or seven times, and several bullets entered Mrs. Decker's body. It is not entirely clear from the record whether she was struck three, or five, times.

sion. It appears from appellant's testimony that Mrs. Decker only picked up the pistol after she was slapped and shoved against the table by her husband. In addition, the record reflects that appellant was under a court restraining order to stay away from his wife, children, and the house in which Mrs. Decker was living. In the face, and in defiance, of this order, he went to the home, and the killing occurred. It is also somewhat difficult to understand the statement that he was afraid ''she would shoot me and shoot the kids, too.'' Only one child was present at the time of the killing, so this remark could have no reference to a fear of immediate danger at the time of the shooting. A belief that she might, at some time in the future, act in accordance with his statement, would, of course, have no bearing on the question of self-defense.

We find no error in the court's refusal to admit the testimony of Lewis Western.

Affirmed.