JAMES MACK NASH *v.* STATE OF ARKANSAS

5477                                    451 S. W. 2d 869

Opinion delivered March 23, 1970

*Martin L. Green* and *Shaw & Bedwell*, for appellant.

*Joe Purcell*, Attorney General; *Don Langston* and *Mike Wilson*, Asst. Attys. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant was charged with first degree murder of Larry McKinney on June 14, 1969. He was convicted of second degree murder and sentenced to five years' imprisonment. He urges three grounds for reversal of that conviction, viz: (1) failure of the circuit court to suppress his alleged confession; (2) failure of the trial court to grant his motion for continuance; and (3) failure of the evidence to support the verdict.

In support of the first ground, appellant now argues that his confession was inadmissible because it was given as a preliminary to a polygraph examination, the results of which are barred as evidence by Ark. Stat. Ann. § 71-2225 (Supp. 1969). His present argument also includes the contention that the alleged confession is so inconsistent that it is obvious that appellant could not have understood what he signed. His motion to suppress was on other grounds, *i. e.,* that the statement was involuntary because the language, comments and innuendos of the officer to whom the statement was made constituted promises of leniency. Although it appears that appellant's present arguments on this ground are without merit, we will not further consider them because they were raised for the first time on appeal. *Petty* v. *State,* 245 Ark. 808, 434, S. W. 2d 602; *Gathright* v. *State,* 245 Ark. 840, 435 S. W. 2d 433. We will review the evidence for the purpose of determining whether, under all the circum-

stances, the statement appellant sought to suppress was voluntarily given.

Nash was 22 years of age, the son of a minister and possessed of education including 1½ years of college. He had experienced two years of Army Service. He had on occasion filled his father's pulpit. At the time of his arrest he was employed at the Whirlpool Corporation factory as a paint operator. On Saturday, June 14, during an investigation by the prosecuting attorney of the circumstances of the killing of Larry McKinney, Nash had agreed to take a polygraph test. While at work during the afternoon of June 16, he was called to his employer's personnel office. Upon arrival there he recognized Officer Tidwell whom he willingly accompanied to the police station for the purpose of taking the test. Sometime after arrival at the station he was taken to Sergeant Bettis, whose primary duty was administering polygraph tests. While the officer stated that he identified himself as a police officer, Nash denies that he knew this. Appellant's statement in this regard is irreconcilable with his contention about promises of leniency by the officer, and his later testimony that he had confidence in Bettis because he knew that Bettis was a police detective.

Bettis testified that he gave appellant a printed form containing a concise explanation of the rights of one in custody as to interrogation as delineated in *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The officer stated that he asked Nash to read the form and that he read from an identical one while Nash followed his reading by reference to the form provided him. According to Bettis, appellant answered affirmatively when asked if he understood his rights and added that he was only going to tell the truth and was willing to sign the appended waiver of his rights to remain silent and to have the advice of counsel. This waiver was signed by Nash, and his signature was witnessed by Bettis and Tidwell.

Bettis' testimony relating to the circumstances leading up to the signing was confirmed by Tidwell, who stated that he left the room after attesting Nash's signature. Nash substantially corroborated the testimony of the officers, but testified that he was asked to sign the papers only as an agreement to take the polygraph test.

After the signing of the waiver, Bettis proceeded with an explanation of the test and after about 10 minutes, Nash proceeded to make a statement of his activities on the occasion of the killing of Larry McKinney. Bettis testified that he typed the statement as it was given over a period of approximately one hour. He also stated that as the typing of each paragraph was completed, it was read back to and confirmed by Nash. At the very inception of Nash's oral statement, he admitted that he had possessed a gun on the evening in question, and had left it at the home of a friend named Bruce Sanders. Nash signed an authorization to Officer Tidwell to pick up this weapon. Tidwell then was recalled to the room and given the authorization. He proceeded to the designated house and returned with a pistol about the time Sergeant Bettis finished typing Nash's statement. The weapon was exhibited to, and identified by, Nash. Bettis then asked appellant to read the typed statement. According to this officer, after Nash finished reading the statement, he asked appellant if he wanted to sign it, and appellant did so in the presence of Officers Tidwell and Brooks. Bettis stated that Nash was so upset and emotional after signing the statement that a polygraph test was not then possible, even though Nash was still willing to undergo it.

While Nash admits that he acted of his own free will, he asserts that he understood that the waiver was signed by him with the understanding that it was given in connection with the taking of the polygraph test. He testified that, in explaining the test, Bettis told him that if he didn't tell the truth not to take the test, because his untruthfulness would certainly be disclosed. Thereafter, said Nash, Bettis advised that "if a

man told him the truth, he would tell a man the truth" and that conflicting stories had been told about the events surrounding the shooting of Larry McKinney Nash also testified that Bettis continually told him that even if he shot and killed McKinney he surely couldn't be held for first degree murder but that the only thing "they" could do was to reduce the charge to "justifiable" homicide or involuntary manslaughter. By way of explanation to the court, Nash testified that Bettis said that he would probably be "booked" for murder, just as one would be "booked" for manslaughter after an automobile accident, and, after two or three days, a judge, upon preliminary hearing, would reduce the charge to "justifiable" homicide.

Appellant admitted that he told Bettis what happened, but said that the statement he signed was not typed until after the officer's assurances about reduction of the charge, and the sergeant asked that he repeat his story while it was being typed. Nash also said that most of the matters set out in the statement were "almost correct," but that "they project a different meaning" and "can be interpreted a different way than from the way I stated." He did deny any knowledge that a shot he fired had struck the deceased, because he said he was running backward and looking the other way when his weapon was fired. He also denied having made some of the remarks contained in this purported statement and attributed to him on the occasion of the shooting.

Nash's claim that he only read parts of the incriminating statement is hardly credible in view of his equivocal testimony on that point. He stated in answer to one question by the trial judge that "I know I read through it. . ." Bettis denied having made any promises to Nash.

The independent review of the record to which we are committed in considering admissibility of confessions convinces us that the circuit judge was correct in holding the statement to be voluntary and admissible.

In so doing, we have given appropriate, but not controlling, weight to the findings of the trial judge. See *Harris* v. *State*, 244 Ark. 314, 425 S. W. 2d 293, cert. denied, 393 U. S. 941, 89 S. Ct. 308, 21 L. Ed. 2d 278 (1968). He stated that he might have felt some concern about appellant's understanding of what had been said and done if the latter were illiterate or dull and unappreciative of the meanings of words and distinctions in words and expressions. His observation of appellant, however, convinced him that Nash was bright and appeared to have understood all that took place. The judge found that Nash had readily admitted that he had been fully warned of all his rights, that there was no basis for any understanding by him that his waiver of rights applied only if he were undergoing a polygraph test, that he could not have been misled, and that he intelligently made the statement with a full understanding of his rights. We note, as did the circuit judge, that appellant is possessed of intelligence and a good vocabulary.[1] Nash displayed a ready perception of questions asked, and an ability to express his answers clearly, comprehensively and fluently. We have no doubt that the statements were voluntarily made. Whatever inconsistencies appear in the text are not such as to evidence any lack of understanding on Nash's part.

Appellant filed two motions for continuance on September 12, 1969, after the case had been set for trial. The first was filed by David T. Westmoreland, who had been employed by appellant's father three months earlier, had represented appellant at the preliminary hearing, had filed his motion to suppress evidence and had represented appellant at the hearing thereon. The motion recited that the attorney had done substantial investigative work. It disclosed that a "certain lack of confidence had developed" between the client and this attorney, asserted that Nash should be

---

[1] For example, the witness said: that Sergeant Bettis explained "which impulses the test reacted on;" that the officer's reading of the printed part of that statement with reference to his rights "was the same thing in essence" as the oral explanation; that he had his gun "in the console of the car."

represented by someone else, and stated that efforts were being made to secure additional or substitute counsel. On the same date, a motion was filed by Warner, Warner, Ragon & Smith, through Wayne Harris, asking that the case be continued until sometime in October to afford adequate opportunity to Harris, as newly retained counsel to investigate and prepare for trial. This motion alleged that lack of confidence in his first attorney developed during conferences beginning September 8 and that Harris would be unable to prepare for trial because he would be in Denver from September 14 through September 17, 1969. No evidence was offered on this motion and an order denying it was not made until the beginning of the trial on September 19.

Appellant's motion for new trial served on September 29 and overruled on October 6 stated that appellant was prejudiced by Harris' inability to prepare for trial and that, before Harris' acceptance of employment, appellant's friends and relatives had unsuccessfully tried to follow Harris' advice to employ another attorney.

The principal part of appellant's argument on this point here has to do with matter that was developed during the course of the trial but not shown to have been made known to the trial court prior to denial of the motion, e. g.: the shooting took place where 200 people were assembled; the state's case was presented through interested witnesses; at least six shots were fired in the vicinity; that appellant was able to present only two witnesses present at the scene, neither of whom saw the critical shot fired. The record does disclose that Westmoreland had subpoenaed 45 witnesses. It also reveals that appellant had caused a subpoena to be served upon a witness who did not appear, but it is not shown what this witness was expected to testify.

Motions for continuance are addressed to the sound judicial discretion of the trial court, and we will not

reverse its action unless we can say that the judge has abused this discretion. *Johnson and Loyd* v. *State,* 247 Ark. 1086, 449 S. W. 2d 954; *Scates* v. *State,* 244 Ark. 333, 424 S. W. 2d 876. When we view the lack of evidence to support appellant's motions, the active participation of Westmoreland, who had made at least enough investigation to subpoena 45 witnesses, and the lack of any showing as to reasons for Harris' anticipated absence or of unavailability of any member of his firm to assist in investigation and preparation for trial, we cannot say that the circuit judge abused his discretion in denying these motions. Furthermore, neither the motion for new trial nor any part of the record demonstrates how appellant was prejudiced, the identity of witnesses who might have been disclosed by pretrial investigation or what such witnesses would have testified. In the absence of a showing of prejudice, we cannot say that the refusal of a continuance is error. *Gathright* v. *State,* 245 Ark. 840, 435 S. W. 2d 433. Appellant argues that he was prejudiced because the identity of the alleged murder weapon became a critical issue and the evidence was so unsatisfactory on this point that appellant could have identified the true owner of the weapon, if granted a continuance. Yet, he had 17 days after the trial to make a showing of prejudice on this score, or any other, on presentation of his motion for new trial, but failed to do so.

The argument here on the insufficiency of the evidence is three-pronged. It is asserted that the evidence does not establish (1) the identity of the killer, (2) the whereabouts of appellant when the fatal shot was fired, (3) the ownership and possession of the murder weapon. None of these grounds was specifically mentioned in the motion for new trial. On this point, appellant only asserted that the evidence was insufficient to support a conviction of first degree murder, in addition to the statement that the verdict was contrary to the evidence. Even if this argument is reviewable, it seems to us that it fell with our holding that appellant's statement was properly admitted in evidence. In that statement Nash told of going up to Larry McKinney, asking who

was fighting, and running away when Louis Wilson chased him and McKinney made threatening gestures toward him. After assuring himself that he was no longer being pursued, he said that he went back to his car, armed himself with a .22 caliber pistol and returned to the scene of the fighting because he was "shook up" about Wilson's and McKinney's "jumping" him. McKinney then came toward appellant, who told him to stop, stated "I have got my _ _ _ _ together now" and fired at the deceased from a distance of five feet. He then stated that he went to his car, told Bruce Sanders' sister to get in and drove to the house where Bruce Sanders lived, taking Sanders, Sanders' sister and Ham Phillips. According to the statement, Sanders hid the pistol, after which Nash and Sanders returned to the scene. It was only necessary that there be other proof that the offense charged was committed by someone. Ark. Stat. Ann. § 43-2115 (Repl. 1964); *Wallis* v. *State,* 245 Ark. 1024, 436 S. W. 2d 273; *Bivens* v. *State,* 242 Ark. 362, 413 S. W. 2d 653. There was evidence that McKinney's wife found him lying on the ground after he had been shot. A police officer also testified that he found McKinney on the ground and sent him to a hospital where he expired at 12:35 a.m. A pathologist who performed an autopsy found a bullet wound in the deceased's right chest which penetrated his lung and caused his death. This, coupled with appellant's statement, was sufficient to sustain conviction of murder in the second degree.

Actually, we find sufficient evidence to sustain this conviction of second degree murder without the incriminating statement. Waldo Sanders testified that he had stopped his brother-in-law McKinney from fighting and was holding his hand in which there was a gun, when he heard a shot and turned and saw Nash going back through a crowd which had assembled. He said that Nash fired at McKinney, saying "You must want to die." McKinney's widow said that as she ran away from the scene after shots had been fired, Nash ran past her and hollered "I gotcha man." This evidence, without going into further details, was sufficient. See

*Long* v. *State*, 240 Ark. 687, 401 S. W. 2d 578; *Rand* v. *State*, 232 Ark. 909, 341 S. W. 2d 9.

The judgment is affirmed.